96 N.J. Super. 415 (1967)
233 A.2d 188
IN THE MATTER OF THE ADOPTION OF CHILDREN BY N. M, APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1966.
Decided August 18, 1967.
*418 Before Judges LEWIS, LABRECQUE and GOLDMANN.
Mr. Harvey Weissbard argued the cause for appellant (Messrs. Querques & Isles, attorneys).
Mr. Morris Dobrin argued the cause for respondent (Messrs. Dobrin, Muscarella & Saunders, attorneys; Mr. Robert E. Pollan on the brief).
The opinion of the court was delivered by LEWIS, J.A.D.
In this matter the Bergen County Court, Probate Division, granted the petition of N (herein stepfather) to adopt S, age 7, and G, age 3, children of his present wife R, formerly Miss V, (herein mother). M, the natural father of the two children (herein father), contested the proceedings as to the older child. He appeals from that part of the judgment allowing S to be adopted by the boys' stepfather.
*419 The trial court, in granting the adoption, made no finding that the father abandoned his child or was an unfit parent. The judge stated that "all of these people are fine people," but he "felt" that the interests of the child would be better served by granting the adoption and terminating the natural relationship between father and child. The validity of that approach to the resolution of a controverted adoption proceeding is called into question by this appeal.

THE ISSUES
M contends that the court failed to make the required statutory finding that he had "forsaken parental obligations" and that no such finding would have been justified by the evidence.
N argues: (1) the findings are adequate and no additional findings are essential, (2) the natural father's consent is unnecessary, and (3) the judgment in his favor is sustainable since the trial court found that the adoption of S was for the child's best interests.

THE UNDISPUTED FACTS
The mother of the two children was pregnant with S at the time she married appellant in 1958. She knew that he was then married to another woman; a divorce from the first wife, however, was obtained later that year. S was born on January 30, 1959, and another son, G, was born January 1, 1963, approximately four months after the parents, who were then living in Michigan, had separated. The father moved to Canada in September 1963 and, eventually, the Michigan Circuit Court entered a default judgment annuling the V(R)-M marriage. That judgment declared that the children were the legitimate issue of the parties, gave their custody to the mother until they reached 18 years of age or "until the further order of this court," awarded $30 per week for their support, and provided for the right of visitation by the father.
*420 M operates three music schools; he has remarried and has a child of that union. Since moving to Canada visits with his son S have been infrequent and neither party has strictly complied with the Michigan order for support and visitation rights. In August 1964 the mother of S and G married N, a widower with four children, and in March 1965 the couple, with their respective children, moved to New Jersey. There is now one child of that marriage. N is employed as a materials engineer.

THE LAW
The history of adoption reaches back into antiquity but was never recognized by the English common law.[1] Such an artificial relationship, with its concomitant rights and responsibilities, exists in our present society solely by legislative authority "to serve a socio-familial policy of prime import." In re Holibaugh, 18 N.J. 229, 233 (1955). Note, In re Coe, 42 N.J. 485, 489-490 (1964). Cf. Nickell v. Gall, 49 N.J. 186, 189 (1967).
The first adoption statute in New Jersey was enacted in 1877 (L. 1877, c. 83, p. 123). The law, as it existed prior to 1954,[2] required the consent of a living, competent and available parent before the parent-offspring relationship could be judicially severed, unless the parent had "forsaken parental obligations or been divorced from the father or mother of the child because of his or her adultery or desertion or extreme cruelty." R.S. 9:3-4(c). The term "forsaken parental *421 obligations" was declared to have the meaning of willful and continuous neglect or failure "to perform the natural and regular obligations of care and support of the child." R.S. 9:3-4(h). See Winans v. Luppie, 47 N.J. Eq. 302, 304-305 (E. & A. 1890). Consent was a jurisdictional prerequisite except in cases covered by the enumerated exceptions. Stawicky v. Stawicky, 12 N.J. Super. 72, 76 (App. Div. 1951); In re Robinson, 26 N.J. Super. 440, 444 (App. Div. 1953). See generally, R.S. 9:3-1 through R.S. 9:3-16, repealed L. 1953, c. 264, p. 1768 et seq., effective January 1, 1954, now N.J.S.A. 9:3-17 to 9:3-36.
The 1953 legislation provides that upon final hearing in private adoption matters, "If, from the [approved agency] report and the evidence presented, the court shall be satisfied that the best interests of the child would be promoted by the adoption, the court shall enter a judgment of adoption." N.J.S.A. 9:3-27 subd. C. Neither our present statutes nor rules of Court (R.R. 4:112-1 et seq.), in such cases, require the natural parents to consent to the adoption. As observed in In re Jacques, 48 N.J. Super. 523, 527 (Ch. Div. 1958), "the Legislature removed an incongruous situation from this field of law, where a justified adoption advantageous to the best interest of the child could be defeated." In short, consents have been replaced by investigations and reports of an approved agency. In re Adoption By B., 63 N.J. Super. 98, 102 (App. Div. 1960). See No. 6 of the listed "Principal Changes" in the statement attached to the new act, which was taken verbatim from the Report of the Advisory Committee on the Revision of the Child Adoption Statute of New Jersey, § IV(6), p. 3 (1953).
It does not follow from that salutary procedural change that the Legislature intended to nullify basic rights of a natural parent or that such rights should be lightly considered. It is fundamental that a statute is to be construed in its entirety "to clear up any obscurities and ambiguities in the law and to make the whole of the law and every part *422 of it harmonious and effective." McCaffrey, Statutory Construction, § 44, p. 86 (1953). The question is one of legislative intent. "The sense of the law is to be gathered from its object and the nature of the subject matter, the contextual setting, and the statutes in pari materia." State v. Brown, 22 N.J. 405, 415 (1956); In re Adoption of D., 78 N.J. Super. 117, 122-123 (Cty. Ct. 1963). The public policy expressed in the statute should be considered. Note, In re T., 95 N.J. Super. 228, 236 (App. Div. 1967). Accordingly, the aforequoted excerpt from N.J.S.A. 9:3-27, subd. C should not be read out of context; other pertinent sections include:
N.J.S.A. 9:3-17, which declares that the act shall be administered in such a way as "to promote policies and procedures which are socially necessary and desirable for the protection of such [adoptive] children, their natural parents and their adopting parents." In attaining these ends it is declared to be "necessary and desirable (a) to protect the child from unnecessary separation from his natural parent * * *; (b) to protect the natural parent from hurried or abrupt decisions to give up the child * * *" (emphasis supplied)[3]; and
N.J.S.A. 9:3-24, subd. C, which in dealing with situations where a preliminary hearing is necessary provides:
"If the court shall determine, from the report of the approved agency and the evidence presented at the preliminary hearing, that a parent of the child sought to be adopted * * * has forsaken parental obligations * * * the court may declare that such parent has no further right to custody of the child * * *." (Emphasis supplied)
*423 Thus it appears that our current laws do recognize, as a matter of public policy, that parental rights are essential factors for judicial consideration in an adoption contest. The parental relationship is an integral part of the "best interests" test; otherwise, any person could adopt a child if he were potentially a better parent than the child's natural mother or father. The welfare of a child is inextricably bound up with the rights of the parent. Note, Bell v. Leonard, 102 U.S. App. D.C. 179, 251 F.2d 890, 894-895 (D.C. Cir. 1958). See generally 2 Am. Jur.2d, Adoption, § 7, p. 866 (1962).
Of especial significance is the statutory provision that in cases where a preliminary hearing is required a court may terminate the right of custody if the parent has forsaken parental obligations. It is incomprehensible that findings of parental fault should be required to terminate a right of custody but are an unnecessary prerequisite for an absolute severance of the parental relationship.
The distinction between custody and adoption has had universal acceptance throughout the literature and law of filial relations. When custody is at issue the court is much more likely to make the temporary grant, always subject to reconsideration, on the basis of the best welfare of the child in light of the advantages and opportunities offered by the competing parties. Deeper and broader considerations, however, are commanded in adoption proceedings where the parent-child relationship is sought to be permanently severed. Hill v. Allabaugh, 333 Ill. App. 602, 78 N.E.2d 127, 129 (App. Ct. 1948); Adoption of Harvey, 375 Pa. 1, 99 A.2d 276, 277-278 (Sup. Ct. 1953); Foster & Freed, "Child Custody (Part I)," 39 N.Y.U.L. Rev. 423, 442-443, n. 92 (1964). As stated by the Supreme Court of New Mexico, adoption should be undertaken only with "the most adequate safeguards against abuse." Barwin v. Reidy, 62 N.M. 183, 307 P.2d 175, 180 (1957).
Normally and logically the blood relationship should be continued in the absence of parental consent unless *424 and until the proposed adoptors clearly and convincingly establish the unfitness, abandonment or neglect of the opposing parent, or other reasons that would justify a judicial finding that the child's best interest would be served by the adoption notwithstanding such parent's tacit or active opposition.[4] See generally, Simpson, "The Unfit Parent: Conditions Under Which A Child May Be Adopted Without Consent Of Its Parents," 39 U. Det. L.J. 347 (1962). While the supreme and controlling goal is the child's welfare and parental consent is no longer necessary, the record must reveal sufficient findings of fact, supported by the evidence, to demonstrate a sound and reasonable basis for any judgment that would cut off the natural link between parent and child. In short, a father has legal rights which should not be dispensed with summarily.[5] This is so because "the enormity of an error is apparent." A. v. M., 74 N.J. Super. 104, 123 (Cty. Ct. 1962).
The name of an adopted child and his right of inheritance are changed and the biological ties with his *425 parent are forever foreclosed by a judgment of adoption. Such an action is of the first magnitude and should be sanctioned only after serious consideration of the consequences. Note, 16 Rutgers L. Rev., op cit., at pp. 390-391. The child's relationship with the parent is of such significance that all doubts are to be resolved against its destruction. Roy v. Holmes, 111 So.2d 468, 470-471 (Fla. D. Ct. App. 1959); In re Perkins, 234 Mo. App. 716, 117 S.W.2d 686, 691 (Ct. App. 1938); Nevelos v. Railston, 65 N.M. 250, 335 P.2d 573, 576 (Sup. Ct. 1959); In re Adoption of Walton, 123 Utah 380, 259 P.2d 881, 883 (Sup. Ct. 1953). A child, however, is not a chattel, and the parent-offspring relationship is a status, not a contract, which status may be altered or abrogated by the state as parens patriae in furtherance of a societal concern for the protection of the child's best interests  the dominant objective to be achieved. See Appeal of Goshkarian, 110 Conn. 463, 148 A. 379, 381 (Sup. Ct. Err. 1930).
Here, it may well be that the adoption of S by his stepfather would be for the boy's best interests; there is some *426 evidence that would so indicate. On the other hand, the father's conduct did not evince a settled purpose to forego all parental duties and relinquish all "like claims" with regard to his son, such as the court found in the case of In re Jacques, supra, 48 N.J. Super., at p. 532. Moreover, in response to the question, "It is a fact or not that you think the child [S] does love Mr. M [his father]?", the mother testified, "Well, I suppose he does."
Whether the proofs sub judice were analyzed and assessed in light of the child's apparent love for his natural father, and in such manner as to give effect to the policy of our law as enunciated in N.J.S.A. 9:3-17, is not clear from the record. The trial court's opinion was strictly conclusory:
"Usually these situations arise where somebody is not fit, but evidently all of these persons are fit persons. * * *
However, I feel that the interests of this child would be better served by being adopted by the plaintiff, the adoptive father, N, and I am going to so rule.
Regardless of anything that happened during the proceedings, my decision is based solely  and I have a deep knowledge of the feeling of a father for a child  it is based that all of these people are fine people, but under the situation with the child it is his interests that become paramount." (Emphasis supplied)
It is basic, under our rules of court, that, "In every contested action tried upon the facts without a jury, the court shall find the facts specially and state separately its conclusions of law thereon * * *." R.R. 4:53-1. Compliance with that requirement is "mandatory." Findings which fail to permit a meaningful review of the evidence relied upon to justify the decision do not satisfy the rule. Testut v. Testut, 32 N.J. Super. 95, 100-101 (App. Div. 1954); Franzoni v. Franzoni, 60 N.J. Super. 519, 521-522 (App. Div. 1960). Cf. Congleton v. Pura-Tex Stone Corp., 53 N.J. Super. 282, 288 (App. Div. 1958).[6]
*427 Justice demands that the judgment granting the adoption of S by his stepfather be reversed and the matter remanded to the Probate Division for findings of fact and conclusions of law sufficient to enable an appellate court to properly perform its reviewing function. See Oszmanski v. Bergen Point Brass Foundry, Inc., 95 N.J. Super. 92, 95 (App. Div. 1967).

THE REMAND
At the hearing on the remand, if the court should conclude that additional evidence is necessary, an opportunity should be afforded counsel to produce it. Since S is now over eight years of age, it may be appropriate to elicit his views. Note the statutory requirements where a child is ten years of age or over. N.J.S.A. 9:3-27, subd. B, 28. If it be necessary to insure that the child is treated as a person with rights and not as an object to be fought over, the court should feel free to exercise its inherent power to appoint a guardian ad litem to make certain that the best interests of the child are duly represented and protected throughout the proceedings. See In re Watson's Adoption, 45 Hawaii 69, 361 P.2d 1054, 1056 (Sup. Ct. 1961), In re Estate of Topel, 32 Wis.2d 223, 145 N.W.2d 162, 165 (Sup. Ct. 1966) (wherein the inherent power of a court to appoint a guardian in an adoption case is recognized); also, Barnes v. Paanakker, 72 App. D.C. 39, 111 F.2d 193, 196-198 (D.C. Cir. 1940), In re Adoption of a Minor, 120 F.2d 720 (D.C. Cir. 1941) (statute mandating that the interests of the "adoptee" be brought "fully before the court for consideration" construed to require appointment of a guardian in an appropriate case). Cf. Barth v. Barth, 225 N.E.2d 866 (Ohio C.P. 1967); Edwards v. Edwards, 270 Wis. 48, 71 N.W.2d 366 (Sup. Ct. 1955); Wendland v. Wendland, 29 Wis.2d 145, 138 N.W.2d 185, 191 (Sup. Ct. *428 1965). Note, Hansen, "Guardian Ad Litem in Divorce and Custody Cases: Protection of the Child's Interests," 4 J. Fam. L. 181 (1964).
That part of the judgment which is on appeal is reversed and the matter is remanded for reconsideration consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] See Brosnan, "The Law of Adoption," 22 Col. L. Rev. 332 (1922). See also Stellmah v. Hunterdon Coop. G.L.F. Serv. Inc., 47 N.J. 163, 171-172 (1966); In re H.D., 17 N.J. Super. 230, 233 (App. Div. 1952).
[2] For a discussion of the pre-1954 law, refer to Silberman, "Adoption in New Jersey  An Analysis of Its Legal Effects and Consequences," 1 Rutgers L. Rev. 250 (1947). A detailed analysis of the current legislation will be found in Note, "Survey of New Jersey Adoption Law," 16 Rutgers L. Rev. 379 (1962).
[3] A review of the transcript of the public hearing held by the Senate Committee on Institutions and Agencies, preceding the enactment of the repealing act of 1953, emphasizes that the public policy of this State includes the protection of the rights of natural parents. The chairman of the Advisory Committee on Revision testified that under the new act "the rights of the natural parents are very important," and "the rights of the natural parents, the rights of the child and the rights of the adopting parents must be passed upon by the court under the normal proper legal process * * *." New Jersey State Law Library, Trenton (No. 974.90/C536/1953a), at pp. 3, 27.
[4] By way of comparison, reference is made to Section 5 of the Adoption Act of 1958 governing adoptions in England wherein seven grounds are enumerated for dispensing with consent. They are: (1) abandonment, (2) neglect, (3) persistent ill treatment, (4) the parent cannot be found, (5) the parent is incapable of giving consent (incompetent), (6) the parent is "unreasonably withholding consent," and (7) the "persistent failure to discharge the obligations of a parent." Samuels, "Adoption: Dispensing With Consent of Parents to Adoption I & II," 107 Sol. J. 688, 707 (1963). So long as the parent seeks to maintain parental rights and has committed no parental offense, the English courts are generally unwilling to sever the relationship of natural parent and child. In his latest assessment of the trend that adoption law is taking in Great Britain, Samuels indicates that more attention is being paid to the welfare of the child. He writes, "The welfare of the child ought openly and statutorily to be made the paramount consideration, while the judge ought always to bear in mind that the preservation of the mother-child [father-child] link, whenever reasonably possible, is an important aspect of that welfare." "Adoption: Dispensing With Consent," 109 Sol. J. 798, 800 (1965).
[5] The right of a natural parent to its child must be included with the bundle of rights associated with marriage, establishing a home and rearing children; as such, it should be viewed as "so rooted in the tradition and conscience of our people as to be ranked as fundamental." Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, 677, 90 A.L.R. 575, 579 (1934), approvingly quoted in Griswold v. Commonwealth of Connecticut, 381 U.S. 479, 487, 85 S.Ct. 1678, 14 L.Ed.2d 510, 517 (1965) (Goldberg, J., concurring). Note also, Id., 381 U.S., at pp. 495-496, 85 S.Ct., at pp. 1687-1688, 14 L.Ed.2d, at p. 522. The Fourteenth Amendment's concept of substantive due process protects the parent-child relationship from unwarranted governmental intrusion. See Meyer v. State of Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, 1045 (1923); Pierce v. Society of the Sisters, 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070, 1078 (1925); Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645, 652, rehearing denied 321 U.S. 804, 64 S.Ct. 784, 88 L.Ed. 1090 (1944); Lacher v. Venus, 177 Wis. 558, 188 N.W. 613, 617, 24 A.L.R. 403, 408-410 (Sup. Ct. 1922). The Amendment is also construed to protect the right of a natural parent to procedural due process when the custody or adoption of its child is being litigated. See May v. Anderson, 345 U.S. 528, 533-534, 73 S.Ct. 840, 97 L.Ed. 1221, 1226-1227 (1953); Armstrong v. Manzo, 380 U.S. 545, 550-551, 85 S.Ct. 1187, 14 L.Ed.2d 62, 66 (1965).
[6] R.R. 4:53-1 is substantially the same as Rule 52(a) of the Federal Rules of Civil Procedure. Thus, note United States v. Horsfall, 270 F.2d 107, 110 (10 Cir. 1959); Woods Construction Co. v. Pool Construction Co., 314 F.2d 405, 406 (10 Cir. 1963); Feather-stone v. Barash, 345 F.2d 246, 249-250 (10 Cir. 1965); 5 Moore's Federal Practice (2d ed. 1966), § 52.05[1], pp. 2643-2644, §§ 52.06[1], [2].