{¶ 54} Although I agree with the majority's analysis and conclusions under the law as it stands, I am compelled to write separately to address certain issues.
 {¶ 55} This case presents extraordinary circumstances not considered or perhaps anticipated by the Ohio Supreme Court, when it formulated its unsuitability test for the determination of custody disputes between a natural parent and a third-party in In re Perales. I recognize the significance of a natural parent's fundamental right to raise his biological child, but I believe that it is time for the Ohio Supreme Court or the legislature to reevaluate the rigid constraints mandated by the current law.
 {¶ 56} Ohio has never before addressed this specific and unique issue regarding custody disputes between a nonparent with the presumption of paternity, who reasonably believed himself to be the biological parent, and a biological parent. The "switched at birth" cases from other jurisdictions are more analogous to the instant appeal, because the nonparents raising the children believed that they were the natural parents of their children, and they had no reason to expect a custody dispute by anyone claiming to be the natural parent.
 {¶ 57} The various states subscribe generally to one of two approaches in custody disputes between parents and nonparents: (1) paramount parental rights/natural parent preference and (2) best interest of the child/psychological parent perspective. See, generally, Foote, What's Best for Babies Switched at Birth? The Role of the Court, Rights of Nonbiological Parents, and Mandatory Mediation of the Custodial Agreements (1999), 21 Whittier L.Rev. 315. In the "switched at birth" cases, the courts adopted the psychological parent perspective. In Florida, the court found that, because Mays (the nonbiological custodial parent) was the only father the child knew, it would be detrimental to the child to declare the Twiggs (the biological stranger parents) her natural parents and force contact between the child and the natural parents. Id., citing Twigg v. Mays (Fla.Cir.Ct. 1993), No. 88-4489-CA-01, WL 339624, at *2; see also Mays v. Twigg (Fla.Dist.App. 1989), 543 So.2d 241. In Georgia, the court adopted the nurture perspective and refused to remove the child from the only mother he ever knew. What's Best for Babies, citing Moore v. Pope (Ga.App. 1990), 396 S.E.2d 243, overruled by Popev. Moore (Ga. 1991), 403 S.E.2d 205. These cases are distinguishable from a Michigan case, in which the court adopted the natural parent preference and returned a child given up for adoption to the child's natural parents. Id., citing DeBoer v. Schmidt (Mich. 1993), 502 N.W.2d 649; see also In re Baby Girl Clausen (Mich.App. 1993), 501 N.W.2d 193.
 {¶ 58} Other courts, even in "paramount parental rights" jurisdictions, have been willing to adopt a best interest of the child test in cases where extraordinary circumstances exist. For example, the Superior Court of New Jersey stated that "where, as a preliminary matter, the third party is able to show that he or she stands in the shoes of a parent to the child and thus in parity with the natural parent, he or she should be accorded the status of a natural parent in determining the standard to be applied to the quest for custody. In such circumstances, the best interests test should apply." Zack v. Fiebert
(1989), 235 N.J. Super. 424, 563 A.2d 58.
 {¶ 59} The Florida Supreme Court addressed a matter involving that state's Department of Health Rehabilitative Services' action against a putative natural father, where the mother was married to another man at the time of the child's birth. The court saw the matter as a case about impugning the legitimacy of a child for the sake of money and impugning the parental rights of the child's present legal father. The court began with the premise that the presumption of legitimacy is based on the policy of protecting the welfare/best interests of the child. "Once children are born legitimate, they have a right to maintain that status both factually and legally if doing so is in their best interests."Dept. of Health and Rehabilitative Servs. v. Privette (Fla. 1993),617 So.2d 305, 307, citing Art. I, § 9, Fla. Const. "The child's legally recognized father likewise has an unmistakable interest in maintaining the relationship with his child unimpugned." Id., citing Santosky v.Kramer (1982), 455 U.S. 745, 71 L.Ed.2d 599.
 {¶ 60} While Ohio has provided the statutory mechanism to rebut the presumption of paternity, I still believe that the legislative intent was not to disrupt the sanctity of the family or impugn the legal father's privacy and parental rights. In fact, I continue to adhere to my analysis set out in my dissent in Lorence v. Goeller (Mar. 6, 2002), 9th Dist. No. 01CA007820 (Carr, concurring in part, and dissenting in part). This issue remains unaddressed by either the Ohio Supreme Court or Ohio legislature.
 {¶ 61} The New York intermediate appellate court stated that "[w]hile the presumption of legitimacy is, of course, rebutable, it `will not fail unless common sense and reason are outraged by a holding that it abides.'" H. v. P. (1982), 457 N.Y.S.2d 488, 491. The policy behind the paramount natural parental rights presumption was well reasoned, when nature and nurture shared a common ground. I believe that unique and extraordinary circumstances like those before this Court in the instant matter on appeal, however, necessitate a fresh look at the interests involved, rather than a rigid recitation of the Perales standard .
 {¶ 62} I concur in the majority's decision, only because I find that the current state of the law mandates this holding.